# In the United States Court of Federal Claims

No. 08-551C

(Originally Issued Under Seal: September 12, 2008)

(Reissued with Redactions: September 30, 2008)[1]

* * * * * * * * * * * * * * * * * * * * * *

KLINGE CORPORATION,

        *Plaintiff*,

v.

THE UNITED STATES,

        *Defendant*,

and

SEA BOX, INC.

        *Intervenor*.

Bid protests; Alleged bad faith in cancelling procurement; Injunctive relief; Bid preparation costs.

* * * * * * * * * * * * * * * * * * * * * *

*Richard P. Rector* and *Seamus Curley*, Washington, DC,  for plaintiff.

*Christopher L. Krafchek*, United States Department of Justice, Civil Division, Commercial Litigation Branch, Washington, DC, with whom were *Gregory G. Katsas*, Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Kirk Manhardt*, Assistant Director, for defendant.  *Brent Curtis*, Marine Corps Systems Command, Quantico, VA, of counsel.

*Robert Farber*, Cherry Hill, NJ, for intervenor.

## OPINION

---

[1]This opinion was first issued under seal on September 12, 2008.  The parties were directed to propose any appropriate redactions.  Defendant proposed a number of redactions with which plaintiff disagreed.  The court adopted some of the parties' recommended redactions, as reflected herein. Redactions are indicated by the use of asterisks.

This action is brought pursuant to the court's bid protest jurisdiction. Plaintiff, Klinge Corporation ("Klinge"), alleges that the United States, acting through the Marine Corps Systems Command ("the agency"), has acted arbitrarily, capriciously, and in violation of law, in soliciting quotations under the General Services Administration Federal Supply Schedule ("GSA FSS" or "FSS") for the delivery of "Large Field Refrigeration Systems" ("LFRSs"). A related procurement has been before the court previously. In an earlier bid protest with the same party alignments, plaintiff successfully protested an award to Intervenor, Sea Box, Inc. ("Sea Box") under a Request For Proposals ("RFP") for an indefinite delivery, indefinite quantity ("IDIQ") contract for between 10 and 300[2] LFRSs. *See Klinge Corp. v. United States*, 82 Fed. Cl. 127 (2008) ("*Klinge I*"). We held that Sea Box could not receive the award because the agency's failure to disqualify it for non-compliance with the Trade Agreements Act ("TAA"), 19 U.S.C. §§ 2501 *et seq.* (2000), was arbitrary and not in accordance with law. *Klinge I*, 82 Fed. Cl. at 137-38.

Although Klinge was next in line to receive the award, the agency did not offer the contract to it. Instead, without formally cancelling the RFP, the agency decided to procure 150 LFRSs through a Request For Quotations ("RFQ") for a task order under the GSA FSS. Plaintiff now has filed this follow-on bid protest to enjoin award under the RFQ, claiming primarily that the agency intentionally thwarted our prior ruling in an effort to steer the contract to Sea Box. It also argues that the agency's conduct amounts to a de facto cancellation and that this is arbitrary and irrational conduct. On August 1, 2008, we entered a preliminary injunction, enjoining award of the task order until the court had been better informed of the agency's rationale for not making the purchase through the original RFP. Although Klinge is not a bidder under the task order, we agreed that it would have standing not only to challenge the apparent cancellation, but also to challenge the task order award because of what appeared to be a link to the prior procurement.

We have reviewed the administrative record in this second procurement, as supplemented by a memorandum from the contracting officer ("CO"). Oral argument on the plaintiff's request for permanent injunctive

---

[2]The RFP states that the maximum number of LFRSs under the contract would be 300. There was a possibility of four follow-on option contracts, however. The parties disagree as to whether the maximum number applies per year, or to all years, including the option years.

relief was held on September 8, 2008.  For reasons set out below we conclude that, while there was prejudicial error in the agency's de facto cancellation of the first procurement, the error does not implicate the integrity of the present procurement and hence does not warrant injunctive relief.  At most, it can be said that there is a causal connection between the first and second procurements–the RFQ probably would not have been issued but for the mistake in not pursuing the RFP.  Yet, injunctive relief is extraordinary relief, and we conclude that the mistakes made in connection with the first procurement occurred in good faith and that cancelling the RFQ is unwarranted.  Instead, we award bid preparation costs to plaintiff.

## BACKGROUND

The RFQ under the FSS is somewhat different from the RFP.  Instead of an indefinite quantity, the present RFQ is for a definite, one-time quantity of 150 LFRSs, although "[i]f additional items are required in subsequent years, this process will be repeated."  (Administrative Record ("ARII") at 2.)  The original RFP had eight CLINs.  The first was for the LFRS itself, the second was for a spare refrigeration unit ("RU"), and the third was for spare parts.[3]  The present RFQ only calls for the LFRSs themselves.  The critical performance factors for the LFRS are virtually identical, although one is deleted.  The agency no longer requires the refrigeration unit to cool to 32°F in less than 45 minutes and to 0°F in less than one hour.

At the time the agency initially did a market survey in 2006, it could not do a purchase from the FSS because the LFRS was not offered by anyone on the schedule.  At some point after Klinge began to protest the procurement, the schedule was modified and more than one company (but not Klinge) was qualified to furnish LFRSs.  Klinge thus is not qualified under the GSA FSS; Sea Box, and apparently at least one other company, are.  In addition, in the interim, Sea Box has apparently solved its TAA problem by agreeing to move assembly of the LFRS from China to New Jersey.  Sea Box and at least one other contractor responded to the RFQ, and the agency is poised to make an

---

[3] The five other, less important, CLINs are as follows: (4) a full size RU training aid; (5) technical documentation and data; (6) a training program for use with the LFRSs; (7) one actual two day training program conducted with 10 students; and (8) the hosting of various meetings between the contractor and agency.

award.  In short, the RFP has, de facto, been cancelled, and half of the maximum number of LFRSs under the original RFQ will be obtained through a task order for which Klinge is ineligible to compete.

When we directed the agency to file an administrative record with respect to the new RFQ, we cautioned that it should include materials "associated with the IDIQ contract but originating after the court's prior injunction."  When the record was filed, it contained no reference at all to the old RFP and thus it included no rationale for not making an award to plaintiff and no rationale for using the device of a supply schedule task order for obtaining LFRSs.  We conducted a status conference on August 18, 2008, at which counsel for the government suggested that we should infer from the differences between the RFP and the RFQ that the agency must have had good reason not to make the award under the RFP.  In addition, he indicated his understanding that the agency took the position that Klinge was ineligible under the RFP, because its proposal was also not compliant with the TAA.

Neither of the latter rationales appears in the administrative record and we are unwilling to make unsupported assumptions.  Nevertheless, plaintiff's counsel did not oppose defendant's offer to have the CO explain in writing why he elected to treat Klinge as non-compliant and instead chose to use the vehicle of a task order under the FSS.

In his memorandum for the record, filed on August 22, 2008, the CO begins by explaining that, after the court's ruling in *Klinge I*, he assumed that he had to reexamine Klinge's compliance with the TAA, and, in light of the court's analysis, do so based on Klinge's original proposal.  ("August Memo")  Although the memorandum does not explicitly say so, apparently the CO believed that CLIN 0003 of Klinge's original proposal was not compliant with the TAA.  ("[I]f Klinge's proposal did not propose compliant spare parts under CLIN 0003, I could not award to them."  August Memo.)  In addition, and, again, by inference only from the fact that he did not award to Klinge, the CO apparently believed that Klinge would have been compliant only if the CO could take into account what he viewed as modifications Klinge made to its proposal during the protest.  (Klinge views these as clarifications rather than modifications, about which more below.)

In addition, the CO states that it "could have been theoretically possible to revive the solicitation, open another round of discussions–specifically addressing the TAA compliance issue–and then request the Second Final

4

Proposal Revisions." August Memo. He elected not to do this, he explains, because more than a year had elapsed since the original solicitation was issued. He thus viewed it as prudent to conduct another market search.

Apparently, this new market search produced the information that some contractors under the GSA FSS now offered LFRSs. This in turn led the CO to opt for a "dual-track" approach: a single delivery order under the GSA FSS for 150 units, followed by issuance of a Request for Information to "assess the current ability of industry to meet our requirements," hopefully with the result that two or more small businesses would be capable of meeting the agency's needs. *Id.* "This approach allows the Government to make an initial purchase of LFRS units very rapidly to meet our most pressing need via the GSA FSS . . . ." *Id.*

Plaintiff proposed that the court resolve the dispute on the existing record, as supplemented by the CO's memorandum, without motion practice or briefing. Defendant agreed and so did the court. We treated the parties as having orally moved for judgment on the administrative record and instructed them that they could also rely on the prior administrative record filed in the first protest here ("AR I"). Later, at defendant's request, however, we allowed the parties to file accelerated briefs. Oral argument was held on September 8, 2008. For the reasons set out below, we deny the request for permanent injunctive relief.

DISCUSSION

The case is in an unusual posture for a couple of reasons. First, insofar as plaintiff is challenging the cancellation of the RFP, we are faced with the fact that the agency never formally cancelled the first procurement. The reason for this, according to counsel for defendant, is that the CO was under the impression that the RFP had lapsed due to the expiration of the proposals. Like much of defendant's argument, this has no direct support in the record, and the parties were unable to point to any specific time restrictions in the bids or the RFP. Nevertheless, plaintiff does not question the assertion, and we note that over one year had passed between the original submissions and this court's ruling in *Klinge I*. The CO himself notes, however, that he could have "revive[d] the solicitation, [and] open[ed] another round of discussions . . . ." August Memo. In short, the RFP was not cancelled formally and the CO could have revived it by asking Klinge to renew its proposal.

5

The second anomaly concerns plaintiff's standing, or lack thereof, with respect to challenging the RFQ under the FSS. The government argues that Klinge lacks standing to challenge the pending FSS award because it did not submit a bid. Normally, plaintiff would have to be a bidder, or at least a potential bidder, to have standing to challenge a procurement. And, in this case, there is no question that plaintiff is not eligible to bid on the FSS task order because it was not pre-qualified to do so. There is also no question, however, that there is a connection between the RFP and the RFQ. The government concedes that the 150 LFRSs sought in the task order substitute to that extent for the LFRSs sought in the RFP. In effect, there is a single continuing need for LFRSs, and both the RFP and the RFQ were developed to address that same need. Plaintiff was a bidder under the original RFP, and no argument was made in *Klinge I* that it was ineligible for award. In view of plaintiff's allegation that the decision not to award under the RFP was undertaken in a bad faith effort to direct the contract to Sea Box, we reaffirm our initial view that plaintiff has standing to that extent to seek an injunction against the FSS task order. *Accord Distributed Solutions, Inc. v. United States*, No. 2007-5145 (Fed. Cir. August 28, 2008). In addition, however, it clearly would have standing to challenge the de facto cancellation of the first procurement, in which it did participate.

Plaintiff's principal contention is that the decision to cancel, or at least not pursue the solicitation through the RFP, followed by the use of the FSS task order, constitutes bad faith on the part of the agency. It asserts that these decisions were pretextual, and that they were motivated by a desire to keep the contract away from plaintiff and steer it to Sea Box. The short answer to this assertion is that it has no support in the record. This series of procurement decisions was unquestionably inartful, but we have no reason to think they were motivated by malice toward plaintiff or favoritism toward Sea Box. There is no evidence that the CO was ill-disposed toward plaintiff or that he opted for a task order because it would leave plaintiff out. We are left simply with a theory of *post hoc, ergo propter hoc*. But the mere fact that Sea Box lost the first award and is eligible to receive a task order under the second solicitation proves nothing.

Nor does the fact of two overlapping procurements constitute sufficient proof. As the CO correctly implies in his memorandum of August 22, he could have proceeded from day one on two independent tracks: an RFP and an RFQ (assuming the FSS offered LFRSs at that time). Two such procurements, while related, would not be mutually exclusive. And they would be related

only to the extent that purchases under one would obviate the need (at least to the extent of LFRSs) for purchases under the other.

We also have the CO's August 22 memorandum, in which he attempts to explain why he did not use the original RFP to make an award to Klinge. Normally we would not permit this *post hoc*, extra-record explanation, but it is plainly called for here. We quote relevant portions of the affidavit below:

> The Court's June 5, 2008 decision, directing the cancellation of the contract with Sea Box, required me to consider how to view Klinge's TAA compliance. The Court explained that Sea Box's proposal had to be evaluated based on how it had existed in October 2007, that I could not allow Sea Box to modify its proposal by varying what it had proposed so as to remedy TAA compliance defects. Given Klinge's responses to GAO and GAO's finding, I reasoned that the same was true of Klinge's proposal that I could not allow them to modify their proposal during the remand to achieve TAA compliance . . . .

August Memo. We agree with the CO's characterization of the court's ruling and his task, but his implicit finding that the GAO had treated Klinge's proposal as not compliant with the TAA is, as we explain below, wrong.

The balance of that paragraph builds on the error:

> I could not allow them [Klinge] to modify their proposal during the remand to achieve TAA compliance by proposing to provide complying parts where they had not clearly offered complying parts previously. I realized the Court's decision was based on Sea Box's non-compliance with respect to CLIN 0001, but I reasoned that the same rationale applied to CLIN 0003, and that if Klinge's proposal did not propose compliant spare parts under CLIN 0003, I could not award to [it].

*Id.* In short, the CO assumed that the GAO had found Klinge non-compliant with the TAA in respect to CLIN 003 (spare parts). He further treated Klinge's effort to explain why its proposal was compliant with the TAA as a modification of the proposal, and hence not properly before him. We agree that both proposals should receive the same treatment, although we disagree

with both his assumption and his conclusion, as we explain below. Nevertheless, we are not prepared to presume bad faith, and, while we disagree with the CO's reasoning, we have no reason not to take it at face value. Taken at face value, it eliminates the possibility of intentional misconduct.

We believe that the net result of finding no bad faith is that we cannot enjoin the second procurement. As we explained above, there is nothing inherently improper with pursuing two solicitations to procure fungible, but indefinite, quantities of the same item. While the potential purchase under the RFP could have been as high as 300 (or 1500, depending on whose view would prevail), it was still an IDIQ contract with a minimum quantity of only ten LFRSs. There is no necessary inconsistency, in other words, between the two solicitations. While we conclude, as we explain below, that the CO's decision not to pursue the RFP was based on a mistake of law, it was merely a mistake and in no way implicates the integrity of the second procurement. In short, enjoining the second procurement, which, standing alone, is not drawn into question, is not the appropriate remedy.

This leaves plaintiff with the argument that de facto cancellation of the RFP was improper. We begin by stating what has become obvious, at least to the court: the CO erred in assuming that he could not accept Klinge's original proposal because it only became TAA compliant after modification.

In the original procurement, as discussed in our prior opinion, there were two appeals by Klinge to the GAO. The first was successful in effect, although it was dismissed as moot. It resulted in the agency re-inserting Klinge into the competition. The second was not. In the process of denying Klinge's assertion that Sea Box was not TAA compliant, the GAO had occasion to refer to whether Klinge's proposal complied with the TAA with respect to CLIN 003, the spare parts line item, in a footnote:

> Klinge's proposed list of 23 spare parts . . . included two parts that were described in a separate list in its proposal . . . as being "Non-Designated Country" parts and non-US parts, which would appear to render its proposal not compliant with the [TAA]. . . . In response to questions from GAO during this protest, Klinge explained that while it intended to use two Chinese-made parts in the LFRSs it would deliver to the agency, the two parts when included in the CLIN 0003 parts support package instead would be made in the U.S. or Mexico (a

8

designated country). . . . Klinge's claimed intention was not apparent from its proposal.

*Matter of Klinge Corp.*, B- 309930.2, 2008 CPD ¶ 102 at 8, fn. 5, 2008 WL 2264491 (Feb. 13, 2008). This excerpt is presumably what the CO relied on in assuming that Klinge was TAA non-compliant.

There is no question that Klinge's proposal would not have been non-compliant merely because its LFRS itself included two non-designated country spare parts. The test under the TAA is phrased in terms of whether the item being purchased undergoes substantial transformation in the United States or a designated country. On the other hand, *any* non-designated country parts included on the spare parts list would, however, have made the proposal non-compliant.[4]

Maintaining the distinction between parts incorporated into the purchased item itself and those on the spare parts list, is, therefore, critical. It is also apparent that Klinge's explanation to the GAO, taken at face value, demonstrated that it understood that distinction and that its proposal had been compliant from the beginning. The GAO comment did not pick up that

---

[4]A U.S.-made end product is an article that:

(i) is mined, produced, or manufactured in the United States; or
(ii) is substantially transformed in the United States into a new and different article of commerce with a name, character, or use distinct from that of the article or articles from which it was transformed.

Defense Federal Acquisition Regulation Supplement ("DFARS") 252.225-7021(a)(12).
Articles listed on the spare parts list of the RFP do not undergo substantial transformation (i.e., become a new and different article of commerce with a distinct name, character, or use) in any country except the country where it is mined, produced or manufactured, as it is a product not being combined with any other article before it's final use as a spare part. Therefore, all spare parts offered in CLIN 0003 must be U.S.-made, qualifying country, or designated country end products to be TAA compliant.

distinction, but it was, in any event, not a finding of non-compliance. At most, it is an observation (not necessary to its recommendation) that there was ambiguity about Klinge's proposal.

Another distinction also matters: the difference between modifications to proposals on the one hand and explanations on the other. The latter do not constitute changes. During that second protest at GAO, both Sea Box and Klinge provided further supplementation regarding their TAA compliance. As we held previously:

> Sea Box changed its prior explanations by representing that "the country of origin for each and every one of the * * * individual parts . . . is either the United States or a designated country." (AR at 1464 (Sea Box letter to the CO, Apr. 10, 2008).) In order to make this representation, however, it explained that it had to get assurance from its primary supplier that the supplier would source all parts from compliant locations, albeit at higher cost to itself. This assurance meant that all * * * spare parts were now to be acquired from the United States or other designated countries. The change also resulted in minor changes in the part descriptions and catalog numbers.

*Klinge I*, 82 Fed. Cl. at 133. Sea Box's proposal, at least with respect to CLIN 003, in other words, changed.

In our prior ruling, we held that the question of whether Sea Box's proposal met the terms of the TAA had to be answered as of the time of the original proposals:

> In light of Sea Box's offer during remand to move its manufacturing operation entirely to the United States, a question arises: must the court consider Sea Box's proposal as it existed in October 2007 or as it existed after the remand. During oral argument, plaintiff and government expressed the view that the question before the court is the reasonableness *vel non* of the CO's original award decision. We agree. The purpose of the remand was to obtain clarification of the proposals as they existed, not to turn clarification into an opportunity for modification. The remand order called for the agency to obtain a description of the "entire process of manufacturing, assembly

> and testing." The agency thus could supplement its
> understanding of what the parties had offered at the time of
> award. Sea Box did not, however, limit itself to explaining its
> existing proposals. Instead it offered, in the April 1, 2008 letter
> from Sea Box's counsel to the CO, the possibility that Sea Box
> could completely alter its method of manufacture by shipping
> the refrigeration unit and the container to the United States. *See*
> (AR at 1424.) We do not view this as properly part of Sea
> Box's FPR.

*Id.* at 134. We thus held that Sea Box's offer to comply with the TAA came
too late.

We drew a distinction at that time, however, between changes to a
proposal, which Sea Box was suggesting, and explanations of an existing
proposal. A proposal revision is "a change to the proposal made after the
solicitation of the closing date, at the request of or as allowed by a Contracting
Officer as the result of negotiations." 48 C.F.R. § 52.215-1(a) (2008). Such
proposal revisions are treated as late and not considered if received any time
after the specified time set for the receipt of offers. *Id.* at § 52.215-
1(c)(3)(ii)(A). An offeror's best and final terms should therefore be contained
in it's initial proposal. *Id.* at § 52.215-1(f)(4).

Whereas a revision to a proposal by a contractor is prohibited after the
deadline set by the agency for receipt of offers, a proposal clarification is
allowed even after the award of a contract. Generally, permissible
clarifications include perceived deficiencies, weaknesses, errors, omissions,
or mistakes in the proposal. *See* 48 C.F.R. § 15.306(b) (2008).
Communication of such post-award clarifications is permitted, provided it does
not afford the offeror an opportunity to revise it's proposal. *Id.*

In sum, a clarification of a bid proposal by an offeror is one that does
not materially alter the content or form of the proposal. However, when the
content or form of the proposal is altered rather than merely explained during
the communication, a revision has occurred, and the integrity of the
procurement process itself is placed in jeopardy. Sea Box's offer to transfer
it's manufacture location during the requested clarification process went
beyond mere explanation of a perceived TAA deficiency in its original
proposal. It was a material alteration of the content of its proposal to become
TAA compliant.

11

As we indicated above, the CO took the position that Klinge, like Sea Box, had changed its proposal. It is not clear what the CO viewed the change to be. In his affidavit, he assumes, without explanation, that Klinge's clarification to the GAO and on remand in the first COFC protest as to why its proposal did not violate the TAA with respect to CLIN 0003 was a change. It plainly wasn't.

At one time, the CO seemed to share this view. In the prior protest here, in an affidavit dated April 14, 2008, the CO told the court that

> Klinge provided a clear and concise statement from its vice president, Mr. Steve Hynoski. His statement and the four attachments fully explained Klinge's understanding of its obligations regarding the TAA. Mr. Hynoski set forth Klinge's intent to comply with the TAA regarding CLIN 0003 by ensuring that only parts from the U.S. or designated countries are supplied. Specifically, he explained that parts * * * and * * * would be of Mexican origin for CLIN 0003. . . . I find that Klinge both understands its TAA obligations and is fully capable of complying.

(McGinn Aff. at 1, Apr. 14, 2008.) Presumably this explains why the government did not argue in the earlier protest that Klinge was disqualified itself under the TAA.

The CO erred, therefore, in assuming that he would have had to reopen discussions with the bidders under the RFP in order to consider Klinge's proposal.[5] The remaining question is what do we do with this conclusion?

Plaintiff contends that the de facto cancellation can be set aside on a demonstration that the decision was irrational or not in accordance with law, and that it plainly was, given the court's conclusion that Klinge was TAA

---

[5]As plaintiff points out, one mystery that still persists is why, even if he viewed Klinge as ineligible, the CO did not move on to the third bidder. The procurement was sufficiently muddled and prolonged at that point, however, that the court can credit the apparent battle fatigue which had set in as the cause.

compliant.  We agree that something short of bad faith can be sufficient to call into question the cancellation of a procurement, *see, e.g.*, *Shields Enterprises, Inc. v. United States*, 28 Fed. Cl. 615, 624-25 (considering whether the cancellation lacked a reasonable basis); *Coastal Corp. v. United States*, 6 Cl. Ct. 337, 343-44 (1984) (applying arbitrary, capricious, not in accordance with law standard), although it is our observation that the cases actually granting relief appear to involve the exercise of bad faith.[6]  And in this case it is clear that the decision not to pursue an award with Klinge cannot have been reasonable.  It was predicated on a mistake of both law and fact, namely that Klinge's explanation of its compliance with the TAA was a modification and not a clarification of its proposal.

The mistake was also, more likely than not, prejudicial.  The CO makes plain that, because he assumed Klinge was not eligible for award, proceeding with the RFP would have meant inviting a new round of modifications from all bidders.  In that scenario, resorting to a FSS task order makes sense.  The real question is whether the appropriate remedy is to enjoin the FSS task order award.  As we explain above, there is no reason to think that integrity of the second procurement is undermined by the mistaken "cancellation" of the first. We believe the mistake, although probably prejudicial, was understandable and innocent.  These circumstances do not warrant the extraordinary[7] relief of enjoining an otherwise unimpeached procurement.

---

[6] *See*, *e.g., Parcel 49C Ltd. Partnership v. United States*, 31 F.3d 1147, 1151, 1153 (Fed. Cir. 1994) (court enjoined cancellation of a solicitation after finding the agency had "launched a campaign to scuttle an award to [plaintiff]" and "illegality permeated the cancellation"); *Northpoint Plaza Ltd. Partnership v. United States*, 34 Fed. Cl. 105, 110 (1995) (court enjoined CO's cancellation after determining that the agency sought to avoid contracting with a particular bidder).

[7] *Baird Corp v. United States*, 1 Cl. Ct. 662, 664 (1983).

Two[8] of the considerations we must take into account when considering to grant injunctive relief are the degree of irreparable injury to the plaintiff if we reject injunctive relief, and the corresponding degree of injury to others if we do grant relief.  Plaintiff concedes that * * *.  In addition, if we granted injunctive relief, the agency would only be obligated to ask for ten LFRSs from plaintiff, assuming it received the award under the RFP.  Moreover, if we granted relief, at least one third party who had no responsibility for the mistakes in the first procurement would be directly and negatively impacted, by losing the FSS task order award.  In sum, the balance of harms does not weigh in plaintiff's favor.  We therefore deny injunctive relief and grant the alternative relief requested, reimbursement of bid preparation and proposal costs.  *See* 28 U.S.C. § 1491(b)(2).

## CONCLUSION

For the reasons explained above, plaintiff's request for permanent injunctive relief is denied.  Plaintiff's request for reimbursement of its bid preparation costs is granted.  The parties are directed to confer in an effort to agree on the amount of the judgment and report to the court in a joint status report on or before September 26, 2008.

s/Eric G. Bruggink
ERIC G. BRUGGINK
Judge

---

[8]The third, consideration of the public interest, clearly weighs in favor of correcting the mistakes made in the first procurement, although that can be done, in part, by granting plaintiff its bid preparation costs.  Moreover the government, while eager to get on with the procurement, has not argued that pressing national defense needs override concerns about maintaining the integrity of the procurement system.

14